UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| SHEBA MAREE AND JEFF SPIVA, *surviving parents of Jenna Mitchell, f/k/a Caleb Mitchell, deceased*,<br><br>                              Plaintiffs,<br><br>– against –<br><br>WARDEN DON BLAKELY, CORRECTIONS OFFICER JAMES LEE ROY IGOU, GEORGIA DEPARTMENT OF CORRECTIONS, and GEORGIA BOARD OF REGENTS,<br><br>                              Defendants. | Case No. 19-CV-46<br><br>**SECOND AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. Jenna Mitchell (birthname "Caleb") died in Valdosta State Prison because the prison and its employees failed to keep her safe, violating her constitutional rights under 42 U.S.C. § 1983 and her rights under the Americans with Disabilities Act and Rehabilitation Act.

2. Jenna died by suicide while housed in solitary confinement, because the Defendants were deliberately indifferent to her serious medical needs and failed to accommodate her mental health disabilities.

3. Jenna's parents now bring this action to vindicate her rights.

## JURISDICTION AND VENUE

4. This action is brought pursuant to the United States Constitution, 42 U.S.C. §§ 1983 and 1988; the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*

5. Subject matter jurisdiction arises under 28 U.S.C. §§ 1331 and 1343.

6. Venue is proper in this Court under 28 U.S.C. § 1391 and other applicable

law because one or more of the parties are domiciled within the Middle District of Georgia and its Valdosta Division, and the events giving rise to this lawsuit occurred therein.

7. All parties herein are subject to the jurisdiction of this Court.

## PARTIES

8. Plaintiff Sheba Maree is a citizen of the state of North Carolina and the natural mother of Jenna Mitchell, who was an inmate at Valdosta State Prison when he died on December 6, 2017.

9. Plaintiff Jeff Spiva is a citizen of the state of Georgia and the natural father of Jenna Mitchell.

10. Plaintiffs bring this claim for wrongful death in their capacity as natural parents of Jenna Mitchell, who was unmarried and had no children. Plaintiffs are applying for appointment as administrator(s) of the estate of Jenna Mitchell and will bring a claim in their representative capacity on behalf of the estate for pain and suffering and punitive damages, at which time the Complaint will be amended accordingly.

11. Defendant James Lee Roy Igou was, at all times relevant herein, an individual residing in the state of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Jenna Mitchell's health and safety.

12. Defendant Don Blakely was, at all times relevant herein, an individual residing in the state of Georgia who was employed as a prison warden by the Georgia Department of Corrections, acting under color of state law, and responsible for Jenna Mitchell's health and safety.

13. Defendant Georgia Department of Corrections ("GDOC") is the state

prison system, an agency of the State of Georgia.  At all relevant times, it operated the Valdosta State Prison, a public facility with programs and services for which Jenna Mitchell was otherwise qualified.  GDOC is a recipient of federal funds.  GDOC is sued for compensatory relief only under federal law.

14. Defendant Georgia Board of Regents, located in Augusta, is a component of the Augusta University system, a public university in the State of Georgia.  Through a subsidiary called Georgia Correctional Health Care ("GCHC"), the Board is responsible for providing health care, including mental health and psychiatric care, to GDOC prisoners, including prisoners at the Valdosta State Prison, pursuant to a contractual arrangement with GDOC.  GCHC is sued for compensatory relief only under federal law.

## FACTS

15. Jenna Mitchell had a well-documented history of mental illness, self-harm, and suicidal ideation and attempts.  Jenna's diagnosed conditions included bipolar disorder, schizophrenia, and gender dysphoria.

16. At all relevant times, Defendants herein were aware of the foregoing medical conditions and Jenna's history of self-harm.

17. Jenna's schizophrenia, bipolar disorder, and untreated gender dysphoria substantially limited her major life activities, including self-care, sleeping, speaking, concentrating, thinking, communicating, and working.

18. On December 2, 2017, Plaintiff Sheba Maree telephoned Valdosta State Prison and informed an employee of Defendant Blakely that Jenna had threatened suicide.  She asked to speak with Defendant Blakely and implored the Prison to place Jenna on "suicide watch," a unit for inmates at high risk of death by suicide, where the means of self-harm are

significantly restricted and inmates are under constant supervision. The employee told Plaintiff Maree that Jenna was already "in medical" for a suicide attempt and was "okay."

19. The employee conveyed the information from Plaintiff Maree to Defendant Blakely and other Prison personnel.

20. Jenna was nonetheless placed in solitary confinement on December 4, 2017, and was not kept on suicide watch.

21. Jenna had been in solitary confinement off and on for nine months.

22. Jenna was frequently attacked by other inmates and/or correction officers as the Prison consistently failed to keep Jenna safe.

23. On December 4, 2017, while in solitary, Jenna informed Defendant Igou of her imminent intention to commit suicide by hanging.

24. Defendant Igou did not help Jenna. Defendant Igou did not send for assistance, remove the means of committing suicide from Jenna's cell, or remain in a place where he could observe Jenna and ensure that she did not die by suicide.

25. Instead, Defendant Igou verbally taunted Jenna and encouraged her to commit suicide.

26. As Defendant Igou walked away from Jenna's cell, one or more other inmates told Defendant Igou that Jenna was taking steps to commit suicide.

27. Defendant Igou laughed, and shouted down the cell block that Jenna should wait until he returned before committing suicide because he (Igou) "want[ed] to see" that happen.

28. While Igou was gone, and before he or other staff members returned to the cell, Jenna died from suicide by hanging.

29. While absent, Defendant Igou did not obtain help for a suicidal inmate, and he did not return promptly to the cell block.

30. When Defendant Igou eventually returned, accompanied by one or more additional corrections officers, he found Jenna hanging in her cell.

31. Defendant Igou and the other officers did not lift Jenna to alleviate the deadly pressure being applied to Jenna's throat, and waited for minutes before attempting to cut Jenna down. Defendant Igou and others entered and exited Jenna's cell repeatedly before attempting to administer aid to her.

32. Because the Prison had no "cut down" tool (an instrument used to cut through sheets or other ligatures) in the solitary confinement area where Jenna was housed, it took a very long time to remove the ligature and place Jenna on the ground.

33. Had a "cut down" tool been available and used, Jenna's life could have been saved.

34. A "cut down" or "suicide tool" is standard emergency equipment for prisons, particularly in areas that house inmates at risk for suicide.

35. Having a "cut down" or "suicide tool" on hand, and training officers on its proper use, is the standard of care in prisons, a readily available solution for the risk of inmate suicide, and a widely known reasonable accommodation for people with mental disabilities at risk of suicide.

36. An ambulance was eventually called, and Jenna was transported to a hospital. Jenna died on December 6, 2017, after being in a coma for two days.

37. When Jenna died, she had severe injuries to her face that were the result of physical violence. The Prison claimed that the injuries resulted from Jenna's falling off the

gurney – *twice* – as she was transported to the hospital, but the injuries were not consistent with falling off a gurney.  The Prison and its correction officers allowed Jenna to be physically assaulted or themselves physically assaulted her.

38. Despite knowing of Jenna's high risk of death by suicide, Defendant Blakely and other staff at GDOC housed Jenna in a cell with an obvious "tie off point" (a location where a ligature could be tied and used for hanging), presenting a clear hazard for a potentially suicidal inmate.

39. In the face of this obvious hazard, and despite the availability of a "suicide watch" housing assignment, Defendant Blakely and GDOC did not assign Jenna to alternate housing without this dangerous feature.

40. Cells without "tie off points" are widely known to be a reasonable accommodation for inmates with mental disabilities at risk of suicide.

41. In 1995, the National Institute of Corrections, a division of the United States Department of Justice, published an article entitled "Prison Suicide: An Overview and Guide to Prevention," noting that "claims of negligence or deliberate indifference" may arise from placing inmates in cells with obvious "tie off" points, "especially in the case that combines an inmate known to be suicidal with a cell with exposed lighting fixtures, air vents, or other design features that all but say 'place noose here.'"

42. Such "tie off" points were a standard feature of the Prison's already dangerous solitary confinement cells.  Thus, GDOC denied Jenna this reasonable accommodation for her disabilities.

43. Defendant Blakely and GDOC also housed Jenna with sheets and other items that could be, and were, used as ligatures for suicide by hanging.

44. Removing items that can potentially be used as ligatures is a well-known accommodation for inmates with mental health disabilities that place them at high risk for suicidal behavior.

45. Defendants denied Jenna that reasonable accommodation.

46. At all relevant times, the use of solitary confinement was widely known to be a significant cause of suicidal and other self-harming behavior in correctional facilities. Dozens if not hundreds of published studies and articles have demonstrated a connection between solitary confinement and self-harm.

47. For example, in March 2014, the American Journal of Public Health published an article entitled "Solitary Confinement and Risk of Self-Harm Among Jail Inmates," concluding that self-harm in jails and prisons was "associated significantly with being in solitary confinement … [and] serious mental illness."

48. The study revealed that inmates housed in solitary confinement are approximately seven times more likely to harm themselves than those not housed in solitary confinement.

49. In 2007, the School of Professional Psychology published an article entitled "Inmates Who Attempted Suicide in Prison: A Qualitative Study," noting that solitary confinement was a major factor in suicidal ideation and suicide attempts in prison.

50. In 1995, the National Institute of Corrections, a division of the United States Department of Justice, published an article entitled "Prison Suicide: An Overview and Guide to Prevention," citing to numerous studies linking solitary confinement and jail suicide.

51. The risk of self-harm in solitary confinement is heightened in inmates with known histories of serious mental illnesses and disabilities.

52. The risk of self-harm in solitary confinement is extremely heightened in inmates with known histories of serious mental illnesses and disabilities as well as known histories of self-harming behavior. Jenna had a known history of serious mental illnesses and disabilities, including bipolar disorder and schizophrenia, and of self-harming behavior.

53. The use of alternatives to solitary confinement, including "suicide watch" housing and other mental health observation units, is a well-known accommodation for inmates with mental health disabilities that place them at high risk for suicidal behavior.

54. Defendants denied Jenna that reasonable accommodation.

55. GCHC makes mandatory recommendations to GDOC for housing inmates with disabilities. For example, GCHC would instruct GDOC that inmates who use wheelchairs must be assigned to accessible cells. Despite GCHC's knowledge of Jenna's severe mental illnesses, GCHC made did not recommend housing Jenna safely in light of her mental health disabilities. Thus, GCHC denied Jenna this reasonable accommodation for her disabilities.

56. Similarly, Jenna was housed in a single cell with no cellmate. It was and is well-known in correctional management that inmates with mental illnesses and disabilities are far less likely to successfully die by suicide if they are evaluated or housed with another person. The presence of another person both deters suicide attempts and allows for someone to rapidly intervene in the event of an attempt. Despite the availability of this reasonable accommodation, neither GDOC nor GCHC took any steps to house Jenna with another person.

## FIRST CAUSE OF ACTION

## Under the Americans with Disabilities Act and the Rehabilitation Act

### *Against Defendants GDOC and GCHC*

57. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

58. GDOC and the Board (acting as GCHC) were, at all relevant times, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal money to reasonably accommodate persons with mental disabilities in their facilities, program activities, and services; and to reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. § 794.

59. Further, Title II of the ADA applies to GDOC and GCHC and includes the same mandate as the Rehabilitation Act. 42 U.S.C. §§ 12131 *et seq.*

60. The Valdosta State Prison is a facility, and its operation comprises a program and service, for Rehabilitation Act and ADA purposes.

61. For purposes of the ADA and Rehabilitation Act, Jenna Mitchell was a qualified individual regarded as having a mental impairment that substantially limited one or more major life activities. Defendants GDOC and GCHC knew Jenna Mitchell was a person with mental illness and disabilities who had attempted suicide before.

62. Despite this knowledge, GDOC's officers intentionally discriminated against Jenna, under the meaning of the ADA and Rehabilitation Act, by failing and refusing to provide her medical care during the suicide attempt, placing her in a one-person cell, failing to respond to her expressed suicidal intentions, failing to respond to her suicide attempt, not having a suicide tool available, placing Jenna in solitary confinement, and housing her in a cell

dangerous to people at risk of self-harm with materials known to be dangerous to people at risk of self-harm.

63. Likewise, GCHC's employees failed to accommodate Jenna's disabilities by failing to require GDOC to house her in a cell appropriate for someone with a well-known history of mental disabilities and illnesses, for placing Jenna in solitary confinement, and for failing to provide her with adequate mental health care at any time while incarcerated.

64. Furthermore, both GDOC and GCHC failed to provide Jenna Mitchell with adequate mental health treatment while incarcerated in their facilities.  Providing Jenna Mitchell with adequate mental health care was another available accommodation for Jenna's mental disabilities, which could have prevented her death.

65. Thus, as alleged above, GDOC and GCHC failed and refused to reasonably accommodate Jenna Mitchell's mental disabilities while in custody, in violation of the ADA and Rehabilitation Act.  Those failures and refusals proximately caused Jenna's death.

66. GDOC and GCHC failed and refused to reasonably modify their facilities, services, and programs to reasonably accommodate Jenna's mental disabilities, including by failing to house Jenna safely, failing to provide adequate medical and mental health care to her, and failing to save Jenna from death by suicide.

67. Jenna Mitchell died as a direct and proximate result of GDOC and GCHC's intentional discrimination.

## SECOND CAUSE OF ACTION

### Deliberate Indifference Under the Eighth Amendment and 42 U.S.C. § 1983

#### *Against Defendants Blakely and Igou*

68. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

69. At all times relevant herein, Defendants Igou and Blakely knew that Jenna Mitchell had serious psychiatric disabilities, suicidal ideation, a history of suicide attempts and self-harming behavior, and that Jenna was exposed to significant risks of serious harm.

70. Defendants knowingly failed to take reasonable steps in response to said known risks of serious harm, and such failure not only constituted negligence and gross negligence on their part, but also rose to the level of deliberate indifference as that term is defined by applicable case law.

71. Defendants owed a duty to protect Jenna from a known risk of serious harm while in their custody, but they failed to perform that duty.

72. Defendants' failures to take reasonable action to protect Jenna Mitchell from known risks of serious harm amounted to deliberate indifference to her serious medical needs, including psychiatric needs, in violation of the Eighth Amendment of the United States Constitution.

73. Defendants' deliberate indifference directly and proximately caused Jenna's death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sheba Maree and Jeff Spiva, on behalf of the future Estate of Jenna (Caleb) Mitchell, demands judgment against the above-captioned Defendants as follows:

a. For compensatory damages in an amount to be determined at trial;

b. For punitive damages against the individual defendants in an amount to be determined at trial;

c. For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988, 29 U.S.C. § 794, 42 U.S.C. § 12205, and other applicable laws;

d. For pre- and post-judgment interest as allowed by law; and

    e.    For such other relief as this Court deems just and proper.

Dated: August 30, 2019
New York, New York

DAVID B. SHANIES LAW OFFICE

By: /s/ David B. Shanies

David B. Shanies
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710 (*Tel*)
(212) 951-1350 (*Fax*)
david@shanieslaw.com

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
Sean J. Young
Post Office Box 77208
Atlanta, Georgia 30357
(678) 981-5295 (*Tel*)
(770) 303-0060 (*Fax*)
syoung@acluga.org

*Attorneys for Plaintiffs Sheba Maree and Jeff Spiva*